O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| STAR INSURANCE COMPANY, | Case No. SA CV 13-1930-DFM |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| SUNWEST METALS, INC., | |
| Defendant. | |

## I.

## BACKGROUND

On December 12, 2013, Plaintiff Star Insurance Company ("Star Insurance") filed this action against Defendant Sunwest Metals, Inc. ("Sunwest"), seeking a declaratory judgment that Star Insurance was entitled to rescind two consecutive yearlong insurance policies (the "Policies") on the ground that Sunwest's applications for the Policies contained material

misrepresentations about the nature of its business.[1] Star Insurance further sought reimbursement of its expenses and a $130,000 advance paid to Sunwest under those Policies after an April 2013 fire at Sunwest's facility.[2] Sunwest contends that Star Insurance waived its right to rescind, and Sunwest seeks to recover for breach of contract and breach of the covenant of good faith and fair dealing.[3]

On December 29, 2014, Judge David O. Carter granted in part Star Insurance's motion for summary judgment and denied Sunwest's motion for partial summary judgment.[4] In his order, Judge Carter found that "[i]t is undisputed" that misrepresentations were made about Sunwest's business in its applications for the Policies, and that Sunwest "ha[d] raised no genuine issue of material fact as to the materiality of [those] representations."[5] Judge Carter concluded, however, that Sunwest "ha[d] raised . . . genuine issues of material fact as to whether Star Insurance waived its right to material facts through its failure to conduct a reasonable inquiry."[6]

Shortly thereafter, the parties consented to this Court's jurisdiction.[7] Sunwest then waived its jury demand.[8] This Court conducted a five-day bench

---

[1] See Complaint (Dkt. 1) at 6-8. All page citations to electronically filed documents will use the CM/ECF pagination.

[2] See id. at 8.

[3] See Sunwest's Answer (Dkt. 6) at 8; Sunwest's Counterclaim (Dkt. 8) at 41-42.

[4] See Summary Judgment Order (Dkt. 56) at 28.

[5] See id. at 21.

[6] See id.

[7] See Statement of Consent to Proceed Before a United States Magistrate Judge (Dkt. 63).

[8] See Waiver of Jury Trial (Dkt. 138).

trial from March 31 to April 7, 2015.[9] At the conclusion of the bench trial, the Court ordered the parties to submit closing briefs and proposed findings of fact and conclusions of law, which they did on April 17.[10]

After considering the evidence, briefs, and arguments of counsel, the Court makes the following findings of fact and conclusions of law under Rule 42 of the Federal Rules of Civil Procedure.[11]

## II.

## FINDINGS OF FACT

## A.   The Parties and Key Players

1.      Sunwest operates a recycling collection center in Anaheim, California, where it collects and sorts various recyclable materials to be sold to third parties for recycling.[12]

2.      During the relevant period, Sunwest was initially owned solely by Hanan Stanley ("Stanley"), and then co-owned by Stanley, his wife Sholomith Stanley, and their sons Chase Stanley and Tomer Shine, until Stanley's death on February 27, 2015.[13]

3.      Sunwest has employed Andre McNeal as its accountant since 2004. At all relevant times, McNeal was responsible for procuring insurance

---

[9] See Dkts. 145, 146, 148, 149, and 152.

[10] See 4/7/2015 RT PM at 36; Star Insurance's Proposed Findings of Fact and Conclusions of Law (Dkt. 168) and Closing Argument (Dkt. 169); Sunwest's Proposed Findings of Fact and Conclusions of Law (Dkt. 171) and Closing Brief (Dkt. 170).

[11] Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

[12] Exh. 418 ("Admitted Facts") ¶ 1.

[13] Admitted Facts ¶ 2; Apr. 1, 2015 Reporter's Transcript, Vol. II ("4/1/15 RT PM") at 5.

coverage for Sunwest and served as the primary contact with insurance brokers.[14]

4.  Star Insurance issued two consecutive Commercial Lines Insurance Policies to Sunwest under Star Insurance's Scrap Dealers Program, with policy periods from August 1, 2011, to August 1, 2012, and from August 1, 2012, to August 1, 2013.[15]

5.  Star Insurance was at all times authorized to conduct the business of insurance in the State of California. It is a subsidiary of Meadowbrook Insurance Group, Inc.[16]

6.  Meadowbrook, Inc. ("Meadowbrook") is also wholly owned by Meadowbrook Insurance Group, Inc. Meadowbrook's employees perform underwriting services and administer claims for polices issued by Star Insurance. Meadowbrook acted as Star Insurance's agent in connection with the Policies issued to Sunwest.[17]

7.  During the relevant period, Michelle LeMoine was Meadowbrook's Program Manager for Star Insurance's Scrap Dealers Program, Sue Dubetz was an underwriting assistant, Bob King was the Corporate Referral Underwriter, and Jeffrey Jacobs was an Assistant Vice President and Regional Underwriting Manager.[18]

///

---

[14] Admitted Facts ¶ 3; 4/1/15 RT PM at 4, 44-45, 51-52.

[15] Admitted Facts ¶ 4; Exhs. 82, 105.

[16] Admitted Facts ¶ 9.

[17] Admitted Facts ¶ 10; see also 4/7/15 RT PM at 33 (parties stipulating that conduct of Meadowbrook officer, director, or managing agent could be imputed to Star Insurance for purposes of liability under Cal. Civil Code § 3294).

[18] Admitted Facts ¶¶ 15, 17, 25.

4

**B.** **Sunwest's Operations and Premises**

8. Sunwest purchases recyclable commodities, processes those commodities, and sells them for a profit. Sunwest owns a custom baler, which is used to bale most commodities, making them easier to transport and thus more valuable.[19]

9. Paper and cardboard have historically comprised a significant part of Sunwest's business. Sunwest stored both processed and unprocessed cardboard in its yard. In particular, the cardboard-staging area consistently contained two rows of cardboard stacked four to five bales high. As trucks arrived and were loaded with bales from the staging area, those bales would be replaced by additional bales that were ready for transport, such that the wall of cardboard in the staging area was a permanent fixture in Sunwest's yard.[20]

10. Both the baler and the stacks of cardboard were visible to visitors to Sunwest's yard, and even to people viewing the yard from the street. In addition, aerial photos of Sunwest's yard were hung throughout its offices.[21]

11. During the relevant period, Sunwest's website contained pictures depicting large quantities of paper and cardboard and advertised prices for newspaper and cardboard, as well as other commodities.[22]

12. Although Sunwest documented the quantities of commodities purchased and sold, it tallied those amounts only periodically. This prevented Sunwest from providing precise breakdowns of the percentages of various commodities being processed at any given time, but both Stanley and McNeal

---

[19] 4/1/15 RT PM at 9-11; 4/7/2015 RT PM at 25-26.

[20] 4/1/15 RT PM at 10-13, 20-21; Exh. 201 at 13-14, 48; Exh. 202 at 2.

[21] Exh. 207 at 12; 4/1/15 RT PM at 12-13, 15-16, 26-32.

[22] Exh. 146; 4/1/15 RT PM at 16-20, 23-25.

said that cardboard and other paper products comprised a significant, if not the largest, portion of Sunwest's recycling operation.[23]

13.     Each year McNeal elicited insurance quotes from between two and five brokers, seeking the best coverage at the lowest price. McNeal would provide only the most attractive packages for Stanley's review. Stanley would then meet with the selected broker or brokers for 10 to 15 minutes. Although insurance brokers had occasionally sought information regarding the percentage of various commodities processed by Sunwest, its inability to provide precise breakdowns by commodity had not prevented it from obtaining coverage.[24]

**C.     G.J. Sullivan**

14.     G.J. Sullivan Co. Excess & Surplus Line Brokers ("G.J. Sullivan") represented Star Insurance and was its agent with respect to the Policies issued to Sunwest.[25]

15.     During the relevant period, Deborah Mesko was a Vice President and Program Manager for G.J. Sullivan. Mesko oversaw programs through which G.J. Sullivan bound insurance on behalf of insurance companies, including Star Insurance's Scrap Dealers Program.[26]

16.     During the relevant period, Marlene Priolo was a licensed underwriter employed by G.J. Sullivan. Priolo was supervised by Mesko and worked on applications for coverage by Star Insurance, including under its

---

[23] 4/1/15 RT PM at 37, 43-46, 76; Exh. 201 at 13-14; Exh. 202 at 2.

[24] Exh. 201 at 13-14, 41-42; Exh. 202 at 2; 4/1/15 RT PM at 25-26, 32-33, 44-45, 51, 90.

[25] Admitted Facts ¶ 11.

[26] Admitted Facts ¶ 11; 3/31/15 RT AM at 22, 26, 29, 30, 89.

Scrap Dealers Program.[27]

17.   For each policy that G.J. Sullivan successfully underwrote and bound under the Scrap Dealers Program, Star Insurance paid G.J. Sullivan a commission of 22%.[28]

18.   G.J. Sullivan did not work directly with insureds but only communicated with retail brokers who submitted applications and other necessary information to G.J. Sullivan.[29]

19.   If the applications and other information provided to G.J. Sullivan by the retail broker on behalf of a proposed insured demonstrated that the proposed insured's risk was within G.J. Sullivan's grant of authority from Star Insurance, G.J. Sullivan could quote the account on Star Insurance's behalf.[30]

20.   G.J. Sullivan's authority was more limited than that of various Meadowbrook personnel, and G.J. Sullivan was therefore required to refer some potential accounts to Meadowbrook for further underwriting before a policy could be quoted.[31]

## D.   **The Dunlaps**

21.   Thomas Dunlap Insurance Agency, LLC (the "Dunlap Insurance Agency") represented Sunwest with respect to the Policies.[32]

22.   The Dunlap Insurance Agency was at all relevant times owned by licensed property and casualty broker-agents Thomas R. Dunlap ("Tom

---

[27] 3/31/15 RT AM at 30-31; 3/31/15 RT PM at 4-6, 60-61.

[28] Exh. 73 at 4; 3/31/2105 RT AM at 32-33.

[29] 3/31/15 RT AM at 33; 3/31/15 RT PM at 61.

[30] Admitted Facts ¶ 12; 3/31/15 RT AM at 22-24.

[31] Admitted Facts ¶ 13; Exh. 423 at 20-25; 3/31/2015 RT AM at 46-48.

[32] Admitted Facts ¶ 5.

Dunlap") and his son Dean T. Dunlap ("Dean Dunlap") (collectively with the Dunlap Insurance Agency, the "Dunlaps").[33]

23.    The Dunlaps represented Sunwest for purposes of its insurance placement for a period of three years, beginning in 2010, when the Dunlaps placed a property policy with Chubb. Tom Dunlap visited Sunwest's facility in connection with securing its insurance coverage.[34]

24.    On or about May 6, 2011, in connection with the Dunlaps' attempts to secure insurance for Sunwest, the Dunlaps entered into a Producer's Agreement with G.J. Sullivan. The Producer's Agreement did not reference Star Insurance or any other specific insurer. G.J. Sullivan agreed to pay a commission of 10% to the Dunlaps for any successful application.[35]

**E.    The Scrap Dealers Program**

25.    Meadowbrook and G.J. Sullivan were authorized to issue policies on Star Insurance's behalf in conformance with Star Insurance's Scrap Dealers Program Underwriting Guidelines.[36]

26.    The Guidelines provided that "[p]lastic and paper recycling are eligible for the program when they are incidental exposures." More specifically, the Guidelines provided that "[t]he collection and sales of plastic and/or paper in amounts greater than 15% will only be considered if fire protection is highly protected."[37]

27.    In practice, an insured that derived more than 15% of its annual

---

[33] Admitted Facts ¶¶ 6-7.

[34] Exh. 201 at 40-41; 4/1/15 RT PM at 25-26, 32, 88-89.

[35] Exh. 25 at 8-11; 3/31/15 RT AM at 32-33, 38-39.

[36] Admitted Facts ¶ 12; Exh. 423 at 22.

[37] Admitted Facts ¶ 14; Exh. 374.

revenue from paper or plastic would not be considered under the Scrap Dealers Program.[38]

28.     Among the materials required of an applicant seeking coverage under the Scrap Dealers Program was a signed G.J. Sullivan Co. Scrap Recycling Supplemental Questionnaire ("Supplemental Questionnaire").[39]

29.     G.J. Sullivan was required to refer a new scrap account with any paper or plastics exposure to LeMoine at Meadowbrook. If an account was ineligible for the Scrap Dealers Program, she had the authority to decline the account. If the account was eligible and within her specific authority, she could provide approval to G.J. Sullivan to quote the account. If the account had any amount of paper or plastic recycling, the account was not within LeMoine's authority, and she had to refer it to King for approval.[40]

F.     **The 2011-12 Policy**

30.     On May 6, 2011, Tom Dunlap e-mailed Mesko a signed Producer's Agreement. On May 10, 2011, Mesko advised Tom Dunlap that his agency had been set up with G.J. Sullivan and that Priolo had been assigned to his account as underwriter.[41]

31.     On May 16, 2011, Tom Dunlap e-mailed Priolo application materials on behalf of Sunwest, including a completed but unsigned Supplemental Questionnaire. The Supplemental Questionnaire indicated that Sunwest's annual sales were comprised of aluminum (80%), iron/steel (20%),

---

[38] Exh. 423 at 129-31, 135-36; 3/31/15 RT AM at 47-48.

[39] Admitted Facts ¶ 18; Exh. 27; Exh. 423 at 34-35; Exh. 25 at 2-3; 3/31/15 RT AM at 44-45.

[40] Admitted Facts ¶¶ 15-17; Exh. 423 at 20-21, 25, 36-37; Exh. 424 at 44-47; 3/31/15 RT AM at 46-47, 52; 3/31/15 RT PM at 64.

[41] Exh. 25 at 3, 6-11; 3/31/15 RT AM at 45-46; 3/31/15 RT PM at 7.

9

and "SMALL AMOUNTS" of nonmetals. The Supplemental Questionnaire further indicated that over the previous four years, Sunwest had processed between 1500 and 1600 tons of materials annually for revenues between $5 million and $6 million a year.[42]

32.  Priolo referred Sunwest's application to Meadowbrook because, among other things, Sunwest's operations included recycling of non-metals and the total amount of coverage sought exceeded her authority. On June 29, 2011, she sent an e-mail to LeMoine requesting authority to quote insurance for Sunwest and attached the Supplemental Questionnaire and other application materials.[43]

33.  On June 30, 2011, LeMoine reviewed Sunwest's application and visited Sunwest's website. She noticed that the website referenced paper and plastic recycling and printed some of its pages. She then sent an sent an e-mail to Priolo that stated in part:

> Plastics and Paper are shown are [sic] recycled items on the web-site. You have already indicated that the plastic is incidental – although the web-site does advertise as a place to bring the bottle deposit returnables. . . .We will need the complete details on plastic and paper – in both revenue and actual amount on the premises.[44]

34.  LeMoine's review of the Sunwest site should have raised significant concerns about Sunwest's eligibility for the Scrap Dealers Program. Sunwest's homepage included a photo depicting stacks of baled cardboard, and

---

[42] Admitted Facts ¶¶ 18-19; Exh. 25 at 2-3; Exh. 27 at 1.

[43] Admitted Facts ¶¶ 20-21; Exh. 77; 3/31/15 RT PM at 8-10, 63-64.

[44] Admitted Facts ¶¶ 22-24; Exh. 57 at 1; Exh. 423 at 37-40, 42-46; 3/31/15 RT PM at 14-17.

other photos depicting paper and plastics recycling appeared throughout the site. The site encouraged corporate visitors to seek Sunwest's services in recycling cardboard, plastics, all grades of paper, and all scrap metals. And the site informed residential recyclers that "[c]ommonly accepted" materials included not only beverage containers but also cardboard, newspaper, office paper, metal wire, scrap metals, electric motors, and appliances. The site's coupon provided prices for aluminum, newspaper, cardboard, plastic, and glass.[45]

35.     Because LeMoine was leaving for vacation, she forwarded to Dubetz, Jacobs, and King both her e-mail to Priolo and the original referral information, so that all of them would be aware of the account in case the information she had requested in her e-mail to Priolo was received while she was out of the office.[46]

36.     On July 7, 2011, at 11:36 a.m., Priolo e-mailed Tom Dunlap, stating in part:

> On the supplemental questionnaire, you indicated that recycling of plastics and paper is a very small amount of the operation. However, on the website it advertises as a place to bring bottle deposit returnables. We will need the complete details on the plastic and paper recycling – in both revenue and actual amounts on the premises.
> Please advise.[47]

37.     On July 7, 2011, at 12:56 p.m., Tom Dunlap responded to Priolo, stating in part: "SCRAP PLASTIC REVENUE=$5,000, USED

---

[45] Exh. 146.

[46] Admitted Facts ¶ 25; Exhs. 57-60; Exh. 423 at 40-41, 45-46, 51-52.

[47] Admitted Facts ¶ 26; Exh. 28.

NEWSPAPER PAPER REVENUE=$10,000."[48]

38.   Sunwest did not provide this information and did not know that it had been provided to G.J. Sullivan. The revenue amounts were understated, even on a daily basis.[49]

39.   Sunwest's expert witness, licensed insurance broker and agent Elliott Rothman, faulted Priolo for not communicating Star Insurance's concerns about Sunwest's suitability for the program directly to the Dunlaps. In the expert witness's view, it would be undesirable to leave those kinds of issues lurking and risk cancellation or rescission of the policy at some later date. As a result, he testified that it would be "customary" to communicate those concerns to the insured's agent.[50]

40.   Similarly, Mesko, Priolo's supervisor, testified that she expected that underwriters such as Priolo would advise brokers that the Scrap Dealers Program was designed to insure metal recyclers, not recyclers whose operations were comprised of significant amounts of other commodities.[51]

41.   On July 7, 2011, at 1:20 p.m., Priolo e-mailed the information provided by Tom Dunlap to LeMoine and Dubetz and requested that they "[p]lease advise as soon as possible if okay to release quote. The agent is scheduled to meet with the insured tomorrow afternoon."[52]

42.   LeMoine was on vacation. Mesko forwarded Priolo's e-mail to Jacobs at 4:57 p.m., stating: "Is there any way we can get an approval on this?

---

[48] Admitted Facts ¶ 27; Exh. 29.

[49] 4/1/15 RT PM at 47-50; Exh. 201 at 50-53; 4/2/15 RT PM at 60, 65.

[50] 4/1/15 RT AM at 33.

[51] 4/31/15 RT AM at 48-49.

[52] Admitted Facts ¶ 28; Exh. 61 at 1-2.

Agent is going on vacation tomorrow . . . . HELP."[53]

43.     Upon receipt of Mesko's e-mail, Jacobs discussed the account with King, who e-mailed Jacobs with a copy to LeMoine on July 8, 2011: "This is approved for the $5M Umbrella and high value auto. The amount of plastic and paper recycling appears to be minimal, but we will want to see the loss control report with an emphasis on property to confirm."[54]

44.     Star Insurance did not typically receive and rarely requested loss-control reports from G.J. Sullivan.[55]

45.     Mesko, LeMoine, and Rothman testified that such reports could result and had resulted in cancellation of policies.[56]

46.     LeMoine testified that she understood King's e-mail to indicate that "he wants to verify the information that he received" regarding the items that required referral of Sunwest's application, including its paper and plastics recycling.[57]

47.     Rothman testified that he understood King's e-mail to seek confirmation of the amount of paper and plastics recycling at Sunwest's facility. Rothman noted that in the context of King's e-mail, an "emphasis on property" suggested that "the hazard or hazards about which Mr. King, and therefore Star, is most concerned is the property hazards rather than third-party liability." Rothman testified that such hazards include "the construction, the condition of any buildings, the nature of the stock – in this case both in the

---

[53] Admitted Facts ¶ 29; Exh. 61 at 1.

[54] Admitted Facts ¶¶ 30-31; Exh. 62 at 1.

[55] 3/31/2015 RT AM at 58-59; 3/31/2015 RT PM at 21-22.

[56] 3/31/2015 RT AM at 25-26; 4/1/2015 RT AM at 26-27; Exh. 423 at 60-61.

[57] Exh. 423 at 68-69.

building and in an open yard – uh, housekeeping issues,  condition of the roof, fire protection, adequacy, and that it's in working order, proximity to fire department – normal things which can increase or decrease . . . an underwriter's perception . . . of how much they are at risk for property damage."[58]

48.　On July 8, 2011, Dubetz e-mailed Mesko with a copy to Priolo to indicate that Sunwest had been approved. Her e-mail reproduced King's language, stating: "This is approved for the $5M Umbrella and high value auto. The amount of plastic and paper recycling appears to be minimal, but we will want to see the loss control report with an emphasis on property to confirm." This e-mail should have put Mesko and Priolo on notice that Star Insurance considered the issue of plastic and paper recycling to be a concern that should be confirmed through the loss control report. Even though both testified that they read this e-mail differently, their testimony was not persuasive.[59]

49.　Priolo e-mailed a quote to Tom Dunlap the same day. Later, revised quotes were also issued. The quotes noted that binding was "subject to acceptable loss control," and one of the Terms and Conditions was provision of "a complete updated application for all coverage parts signed by the insured." The quotes advised that the Dunlaps' commission would be 10%.[60]

50.　On July 27, 2011, Tom Dunlap e-mailed a revised quote to Sunwest.[61]

---

[58] 4/1/15 RT AM at 40-41.

[59] Admitted Facts ¶ 32; compare Exh. 61 at 1 with Exh. 62 at 1.

[60] Admitted Facts ¶¶ 33-34; Exhs. 31, 51-52, 127.

[61] Exh. 126.

51.     Tom Dunlap met with Stanley and McNeal on July 28, 2011, at Sunwest to obtain Stanley's signature on the required application materials, including the Supplemental Questionnaire. Stanley testified at his examination under oath and McNeal confirmed at trial that Stanley signed a blank Supplemental Questionnaire on July 28, 2011. Tom Dunlap presented Stanley only the signature page of the Supplemental Questionnaire.[62]

52.     On July 30, 2011, Tom Dunlap requested the quote be bound and provided Priolo with signed copies of all of the applications, including the 2011 Supplemental Questionnaire.[63]

53.     No one at Sunwest saw the information provided on the Supplemental Questionnaire before it was submitted to G.J. Sullivan. The characterization of Sunwest's paper and plastics recycling operation as minimal was inaccurate, as was the information regarding revenues, tonnage of commodities processed, and payroll.[64]

54.     The first Policy issued by Star Insurance to Sunwest became effective August 1, 2011, providing coverage for commercial property, commercial inland marine, garage liability, commercial auto, and employment practices liability. As indicated in King's e-mail, the Policy provided for $5 million in coverage, making it one of the higher-value policies provided by Star Insurance under the Scrap Dealers Program.[65]

55.     Loss-control reports were required by the Guidelines for all new

---

[62] Exh. 201 at 42; 4/1/15 RT PM at 52; Exh. 39.

[63] Admitted Facts ¶ 35; Exhs. 38, 39, 51, 52.

[64] 4/1/15 RT PM at 36-37, 45-46, 51-54; Exh. 201 at 42-45, 48-50; 4/2/15 RT PM at 60, 65.

[65] Admitted Facts ¶ 36; Exh. 105; Exh. 423 at 23-24, 46-47.

business and were generally performed after binding.[66]

56.    Star Insurance paid G.J. Sullivan a fee of 0.5% of the gross premium to procure a loss-control report.[67]

57.    On August 12, 2011, G.J. Sullivan hired Pacific Inspections, Inc. to perform a physical inspection of Sunwest and submit a loss-control report. G.J. Sullivan paid a flat fee of $125 for this assignment.[68]

58.    Priolo directed her assistant to request the inspection. In the "Special Instructions" portion of the request form, he specified that Sunwest was a "SCRAP ACCOUNT, PLEASE INSPECT ACCORDINLY. PLEASE CONFIRM SPRINKLER SYSTEM, AGE OF SPRINKLER SYSTEM (IF ANY), UPDATES TO SPRINKLER SYSTEM (IF ANY)."[69]

59.    On August 30, 2011, Dubetz e-mailed Priolo, asking, "[W]as loss control ordered on this account? If so, can you mark your file to send me a copy when you receive?" This was the only time in Priolo's experience that Star Insurance or Meadowbrook had followed up on a loss-control report.[70]

60.    On September 1, 2011, Jeff Rott of Pacific Inspections visited Sunwest and spent about 10 minutes at the facility. Rott thereafter prepared a written report using a standard form. Under "Description of stock," he indicated "aluminum, glass & paper." He indicated that the value of the stock ranged from $10,000 to $20,000. Under "Business and Operations," Rott indicated that Sunwest "is a recycling company" that "buy[s] aluminum, glass

---

[66] 3/31/15 RT AM at 53-54, 86-87; Exh. 423 at 54-55; Exh. 424 at 89; 3/31/15 at 20-21; 4/1/15 RT AM at 25, 28.

[67] Exh. 423 at 58-61.

[68] Admitted Facts ¶ 37; 3/31/15 RT AM at 61, 87-88; 3/31/15 RT PM at 20-21.

[69] Exhs. 78-80; 3/31/15 RT PM at 23-24.

[70] Admitted Facts ¶ 38; Exh. 81 at 1; 3/31/15 RT PM at 21-22.

and paper from individuals and fill[s] large dumpster bins. The insured sells the full bins of aluminum, glass and paper to a larger recycling company." Rott was paid about $20 for his work.[71]

61.     Sunwest's records show that it received approximately 500,000 pounds of cardboard the day of the inspection. When Rott visited, the wall of cardboard was visible in the staging area and paper and plastic were being processed in the yard.[72]

62.     On October 5, 2011, Priolo received and reviewed Rott's loss-control report and e-mailed it to LeMoine and Dubetz.[73]

63.     It is difficult to reconcile Rott's loss-control report with Sunwest's applications. Had anyone at Star Insurance compared the information in the loss-control report to the misrepresentations contained in the applications, it is likely that Star Insurance would have discovered that Sunwest was not an appropriate risk for the Scrap Dealers Program. This failure is even harder to understand given King's explicit emphasis on using the loss-control report to verify the suitability of the risk. Testimony from Star Insurance's witnesses that the loss-control report contained no "material difference" from Sunwest's application was not persuasive.[74]

64.     Effective January 1, 2012, Star Insurance issued a worker's compensation policy to Sunwest. LeMoine and Sandra Varela of G.J. Sullivan underwrote the policy and, on January 26, 2012, Rott again inspected Sunwest for the workers' compensation policy. Rott's second report included

---

[71] Admitted Facts ¶ 39; Exh. 69 at 2-10; 4/7/15 RT AM at 28-29, 37-38, 46-47.

[72] 4/1/15 RT PM at 55-60.

[73] Admitted Facts ¶ 40; Exh. 69 at 1; 3/31/15 RT PM at 32-36, 71-72.

[74] See, e.g., Exh. 424 at 119-20.

17

1   photographs of Sunwest that showed large bales of cardboard in the yard.[75]

2         65.     Neither Priolo of G.J. Sullivan nor LeMoine of Meadowbrook

3 received or reviewed Rott's second report. Nor is there any evidence that any

4 other G.J. Sullivan or Meadowbrook employee reviewed the report, although a

5 relatively small number of personnel worked within the Scrap Dealers

6 Program, and as noted above, most were aware of the initial concerns

7 regarding Sunwest's operations.[76]

8         66.     On February 20, 2012, LeMoine received by e-mail an inspection

9 report of Sunwest dated July 2008, prepared by the California Workers

10 Compensation Independent Review Board ("WCIRB"), which provided in

11 part:

12         **Inspected:** 7/18/2008 . . . .

13         **Person Interviewed:** Andrew McNeal, Accounting . . . .

14         **Description of Business:**

15         The insured operates a multiple enterprise. The insured is engaged in

16         buying and selling non ferrous [sic] scrap metal approximately 60%,

17         ferrous scrap metal, 2%; newspaper, computer paper and cardboard,

18         35%; and CRV bottles (glass and plastic), 3%.[77]

19 **G.   The 2012-13 Policy**

20         67.     On June 23, 2012, Tom Dunlap e-mailed Priolo about renewing

21 the Policy, and Priolo advised that she would quote the renewal based on the

22 existing Policy, which was due to expire on August 1, 2012. A renewal quote

---

24         [75] Admitted Facts ¶¶ 41-43; Exh. 423 at 89-91; Exhs. 5, 6; 4/7/15 RT AM at 21-22.

25

26         [76] 3/31/15 RT PM at 38; Exh. 423 at 18-20, 96-97; 3/31/2015 RT AM at 30-31; <u>see supra</u> ¶¶ 32-35, 41-43.

27         [77] Admitted Facts ¶ 44; Exh. 5 at 3.

28

1  was issued on July 3, 2012, and revised thereafter.[78]

2      68.    One of the Terms and Conditions was that the insured "[p]rovide

3  a complete updated application for all coverage parts signed by the insured

4  (each year)." The renewal quote noted the Dunlaps' commission would be

5  10%.[79]

6      69.    On July 27, 2012, Dean Dunlap met with McNeal to obtain

7  signatures for the renewal application. Stanley was ill and could not attend, so

8  McNeal scanned and e-mailed the documents to Stanley to be signed. Stanley

9  signed the documents and dated them that day. Dean Dunlap did not provide

10  a Supplemental Questionnaire to Sunwest.[80]

11      70.    On July 31, 2012, Dean Dunlap sent an e-mail to Priolo,

12  requesting that the renewal Policy be bound, and she issued a binder the

13  following day, agreeing to renew the Policy for an additional year.[81]

14      71.    The renewal was within G.J. Sullivan's authority because there

15  were no changes to the information that had required referral of Sunwest's

16  initial application, so no one at Meadowbrook was involved in the renewal.[82]

17      72.    On August 16, 2012, Jill Ojeda of G.J. Sullivan e-mailed Dean

18  Dunlap, advising that not all of the documents required for binding had been

19  received and a Notice of Cancellation would be issued if they were not

20  received by August 23, 2012.[83]

21

22      [78] Admitted Facts ¶¶ 45-46; Exhs. 44, 94, 95, 137, 138.

23      [79] Admitted Facts ¶ 47; Exh. 46 at 3; Exh. 95 at 2; Exh. 137 at 3; Exh. 138 at 3.

24      [80] 4/1/15 RT PM at 67-69; Exhs. 135, 136, 228-30.

25      [81] Admitted Facts ¶¶ 48-49; Exh. 138 at 1.

26      [82] 3/31/15 RT AM at 97; 3/31/15 RT PM at 39-40.

27      [83] Admitted Facts ¶ 50; Exh. 139.

28

73.     On August 24, 2012, G.J. Sullivan issued a Notice of Cancellation for "FAILURE TO SUBMIT SIGNED RENEWAL FORMS, DRIVER EXCLUSIONS, AND APPLICATIONS."[84]

74.     On September 10, 2012, Priolo e-mailed Mary Pojar of Dunlap Insurance Agency, noting that a Notice of Cancellation had been issued because of the failure to submit "the renewal ACORD application, current MVR's, and signed forms."[85]

75.     On September 12, 2012, Dean Dunlap provided some required materials. But on September 21, 2012, Priolo advised him by e-mail that nine other signed documents were still required. Dean Dunlap responded, "Didn't you get all that with the initial application?" Priolo advised that updated applications were to be submitted at every renewal.[86]

76.     On September 24, 2012, Dean Dunlap provided additional materials, including a Supplemental Questionnaire purportedly signed by Stanley on July 28, 2012. Both Stanley and McNeal have denied the authenticity of the signature on this document, which is dated one day after Dean Dunlap's visit to Sunwest and Stanley's signature on other renewal documents, and weeks before Priolo told Dean Dunlap that a signed Supplemental Questionnaire would be required.[87]

77.     The 2012 Supplemental Questionnaire indicated that Sunwest's annual revenue was comprised of 80% aluminum and 20% iron or steel, with "MIN" amounts of plastic, paper, and glass, comprising only a "SMALL

---

[84] Admitted Facts ¶ 51; Exh. 140.

[85] Admitted Facts ¶ 52; Exh. 149.

[86] Exhs. 150, 153.

[87] Admitted Facts ¶¶ 53-54; Exh. 141; 4/1/15 RT PM at 69-70; Exh. 201 at 53-54.

20

1   AMOUNT OF SALES." This information was inaccurate, as was other

2   information in the 2012 Supplemental Questionnaire. Moreover, the 2012

3   Supplemental Questionnaire was also inconsistent with the 2011 Supplemental

4   Questionnaire in certain respects, most significantly, the 2012 Supplemental

5   Questionnaire indicated that annual payroll was more than three times what

6   was reflected in the 2011 questionnaire.[88]

7   78.    Despite the fact that Priolo had to remind the Dunlaps to obtain a

8   new application and Supplemental Questionnaire in order to move forward

9   with renewal of Sunwest's policy, she was not concerned that the documents

10  ultimately submitted were dated before her reminder, a circumstance that at a

11  minimum should have raised a concern about the origin of those documents.[89]

12  79.    Upon receipt of the signed documents from Dean Dunlap, Priolo

13  issued a Notice of Reinstatement of the Policy on September 25, 2012. She did

14  not review the application materials in detail until a few weeks later.[90]

15  80.    On October 18, 2012, Priolo sent an e-mail Dean Dunlap with the

16  subject line "CA0585871 – Sunwest Metals, Inc. DISCREPANCY," putting

17  the word discrepancy in all capital letters to get the agent's attention:

> In review of the physical inspection that was conducted for the
> mentioned insured, it indicates that his operations consist of "purchasing
> aluminum, glass and paper from individuals to fill large bins and then
> sells the bins to a larger recycling company." However, per the
> supplemental that was submitted to our office, their operations consist of
> the processing of 80% Aluminum and 20% Iron & Steel.

---

[88] Admitted Facts ¶ 54; Exh. 141 at 27-34; compare Exh. 48 with Exhs. 27, 31; see 4/1/15 RT PM at 69-71; Exh. 201 at 54-56.

[89] See 3/31/15 RT AM at 45-47.

[90] Admitted Facts ¶ 55; 3/31/15 RT PM at 47-49, 75-76.

Please confirm the operations and advise within 10 days.[91]

81.    Dean Dunlap responded that he was out of the office and would investigate the discrepancy when he returned. On November 2, 2012, Dean Dunlap e-mailed Priolo, stating:

The application is correct.

80%: Aluminum ($4.0M in sales)

20% Iron/Steel ($1.0M in sales)

Each day the amount varies. The day the inspector came in may have had slightly different numbers. The application is an average of the entire policy year.[92]

82.    This was another missed opportunity for Star Insurance and its agents to determine that Sunwest was not right for the Scrap Dealers Program. Priolo asked the right question and received a response that by any reasonable interpretation was unsatisfactory. But instead of pressing the Dunlaps for a better answer, she did nothing.[93]

83.    After the workers' compensation policy expired on January 1, 2013, Pacific Casualty Services, Inc., performed a workers' compensation payroll audit of Sunwest at its CPA's office in Los Angeles.[94]

84.    Professional Casualty Services, Inc., issued a Workers' Compensation Premium Audit Report with a revised date of March 29, 2013, that provided in part:

///

---

[91] Admitted Facts ¶ 56; Exh. 98 at 1.

[92] Admitted Facts ¶¶ 59, 62; Exhs. 99, 157.

[93] 3/31/15 RT AM at 54-55.

[94] Admitted Facts ¶ 63.

**Description of Operations** . . . .

The Insured, Sunwest Metals, Inc., is a multiple-enterprise corporation engaged in the business of operating a recycling center and providing recycling services for both commercial and residential customers.

For commercial clientele, the insured processes cardboard, plastics, various grades of paper and all scrap metals.

For residential clients, the insured processes newspaper, cardboard, scrap copper, copper wire, brass scrap, office paper, aluminum wire, ferrous and non-ferrous metals and appliances.

During the audit period the insured processed various sorts of materials such as CRV beverage containers, cardboard, paper and both ferrous and non-ferrous materials.[95]

**H.   The April 21, 2013 Fire Loss Claim**

85.    On April 21, 2013, there was a fire at Sunwest's facility, determined to be arson committed by an unknown person.[96]

86.    As a result of the fire, stock in the yard was destroyed, the baler was severely damaged, and both the fence surrounding the premises and the asphalt in the yard were damaged. Sunwest continued collecting recyclable materials from its commercial customers but delayed pickups when possible. Sunwest was unable to bale recyclables, so it was forced to sell those commodities for the lower prices applicable to unbaled commodities. Sunwest closed its walk-up counter for several days.[97]

87.    On April 22, 2013, Dean Dunlap notified G.J. Sullivan of the fire

---

[95] Admitted Facts ¶ 64; Exh. 7 at 2.

[96] Admitted Facts ¶¶ 65, 76.

[97] 4/1/15 RT PM at 77, 81-84.

23

and provided loss notices.[98]

88.    The claim was assigned to Tony Smith of Meadowbrook for investigation and adjustment of the loss. Rande Kaufman oversaw the claim handling as Corporate Claims Vice President for Meadowbrook. Star Insurance retained Van Meredith of Vericlaim, Inc., to assist with the investigation of the fire loss. Meredith retained Bob Underwood of Werlinger and Associates to review the scope of repairs needed for the baler. Sunwest retained The Greenspan Co./Adjusters International ("Greenspan") to represent it in the fire-loss claims process.[99]

89.    On April 24, 2013, Priolo e-mailed Meadowbrook's claims department, attaching photographs of the fire damage and the November 2, 2012 e-mail from Dean Dunlap confirming Sunwest's operations were 80% aluminum and 20% iron and steel. She noted that in the photos "there appears to be several bails [sic] of cardboard and paper." The following day, Judith McKinney, Smith's supervisor at Meadowbrook, asked that Priolo send a copy of Sunwest's application and made a Claim Note: "Will have to verify if [underwriter] was aware of additional operation at location."[100]

90.    On April 26, 2013, Smith, Meredith, Underwood, Stanley, his son, two Greenspan employees, and a representative of the manufacturer of Sunwest's baler inspected the fire loss. Meredith advised Sunwest that the lost stock outside the building, the debris-removal costs related to that stock, and the damage to the asphalt were not covered under the Policies and that there

---

[98] Admitted Facts ¶ 66; Exhs. 100-101.

[99] Admitted Facts ¶¶ 68, 69, 73, 78; Exh. 2 at 31-33; 4/15/2015 RT PM at 78; Exh. 323.

[100] Admitted Facts ¶ 67; Exh. 4; Exh. 2 at 36.

was a $10,000 limit for fence repair or replacement.[101]

91.    On April 28, 2013, Meredith provided a report to Smith about the inspection. He stated that "the insured will also suffer a business income loss," estimated at $100,000, and requested permission to retain a forensic accountant. Meredith recommended an advance payment of $200,000 be paid to Sunwest.[102]

92.    On April 28, 2013, Smith sent a reservation-of-rights letter to Greenspan, explaining the Policy provisions regarding stock, paved surfaces, and fencing.[103]

93.    On April 29, 2013, Smith, Meredith, Kaufman, and other employees of Meadowbrook and G.J. Sullivan had a telephone conference about the Sunwest fire loss. Following the roundtable, Smith instructed Meredith to obtain a recorded statement from Stanley and ask about "the portion of the business as related to cardboard vs. metal."[104]

94.    On April 30, 2013, Meredith obtained a recorded statement from Stanley. Stanley's attorney and two Greenspan representatives were present. During the interview, Stanley stated that Sunwest was "a scrap metal company buying recyclable materials from the public as well as from industrial accounts." He stated that Sunwest also handled paper products and plastics. When asked to provide a breakdown between those three commodities, he responded that he would "have to look at the books and figure it out." Stanley

---

[101] Admitted Facts ¶ 70; Exh. 321 at 2; 4/1/15 RT PM at 78; 4/2/15 RT AM at 61, 64-65.

[102] Admitted Facts ¶¶ 74-75; Exh. 321.

[103] Exh. 322.

[104] Admitted Facts ¶¶ 77, 79; Exh. 2 at 31; 4/3/15 RT PM at 11-12, 15-16; Exh. 324 at 2.

stated Sunwest was "probably handling more volume in paper products than metal," but that the "business fluctuates all the time." Stanley explained that the baler handled all commodities, including cardboard, plastic, aluminum, and some light-gauge steel.[105]

95.     On April 30, 2013, Smith inquired about the recorded statement, and the following day Meredith reported that it "went well." Smith noted that "obviously no one is happy around here or in corporate about the way the policy's [sic] were written and the [insured's] apparent misrepresentation of his business to us."[106]

96.     On May 2, 2013, Smith prepared a Large Loss Report for senior management, noting that the "Plan of Action" included "[h]av[ing] Forensic accountant review and analyze stock documentation by insured to verify coverage." The same day, Smith advised Meredith that Star Insurance would advance a payment of $130,000 to Sunwest for its fire loss. Stanley signed a partial proof of loss for that amount, and on May 6, Star Insurance issued the payment.[107]

97.     On May 10, 2013, Star Insurance involved its Special Investigations Unit to investigate whether Sunwest was involved in the arson.[108]

98.     On May 10, 2013, Smith instructed Meredith by e-mail to: request three years of financial documents from Sunwest; obtain the most recent inventory of inside and outside stock conducted before the fire; obtain

---

[105] Admitted Facts ¶ 80; Exh. 202 at 2, 9.

[106] Exh. 326 at 1-2.

[107] Admitted Facts ¶¶ 81-83; Exh. 8 at 2; Exhs. 206, 288, 327.

[108] Admitted Facts ¶ 84; Exh. 2 at 27.

documentation regarding the purchase and maintenance of the baler and conveyor; verify the frequency of baler repairs with the repairer; "follow up for police and fire reports"; provide a "comprehensive report" regarding Stanley's recorded statement; complete a co-insurance review on all covered property; determine whether Sunwest had been inspected by any regulator in the previous few years; and obtain a copy of the video footage of the suspected arsonist.[109]

99.   On May 21, 2013, Meredith submitted his first report to Star Insurance. He reported that Sunwest had provided a baler-repair estimate of $328,000, but the expert retained by Star Insurance reported that the baler could be repaired for $294,700. Meredith noted that the baler was partially operational by the first week of May. He reported that repairs to the asphalt in the yard had cost $11,585 but were excluded from coverage. Repairs to the fence would cost approximately $15,000, but the Policy provided only $10,000 for fences. He reported that the damaged cardboard in the yard was not covered due to the exclusion for "inventory in the open." Although Meredith noted that this exclusion would also eliminate coverage for debris removal of that stock because debris removal applied only to covered property, he noted Sunwest's claim that debris-removal charges were Extra Expenses, and he was uncertain whether debris removal qualified as "repair or replace[ment of] property." Meredith recommended a second advance of $148,700.[110]

100.   On May 29, 2013, Meredith retained accountant Kenneth Brown of Buchanan Clarke Schlader, LLP.[111]

---

[109] Admitted Facts ¶ 85; Exh. 335.

[110] Exh. 9.

[111] Admitted Facts ¶ 84; Exh. 349.

101.   Also on May 29, Smith sent a letter to Greenspan, drafted with Kaufman's input, requesting a 30-day extension of time to complete analysis of both damages and coverages. Smith requested information for use in processing the "business interruption portion" of the fire-loss claim. In particular, Smith's letter stated that "[w]e need to conclude our investigation on this portion of the matter and in order to do so need evidence from you as to the type of and breakdown percentages for commodities you process at the insured premises along with supporting demonstrative evidence to support the same." Kaufman testified that the information sought about commodities processed by Sunwest was not necessary to a business-income claim. Brown did not use information about these percentages to calculate the business-income claim.[112]

102.   Kaufman admitted that the statement in the May 29 letter that Star Insurance required documentation of Sunwest's commodities breakdown for its business-income calculation was "incomplete." She further testified that Star Insurance did not disclose its complete reasons for seeking that information to Sunwest because "if we tell them this is why we want it, that we're looking at possible rescission of the policy, they clamp up, we don't get it, and then it goes into unnecessary litigation."[113]

103.   On May 30, 2013, Meredith reported to Smith that the "stock commodities were about 1/3 each of paper/cardboard, metal and plastic."[114]

104.   On June 24, 2013, counsel for Star Insurance requested that Stanley appear for an examination under oath. Although Stanley agreed to

---

[112] Exh. 10 at 1; 4/3/15 RT PM at 36; 4/7/15 RT AM at 107.

[113] 4/3/15 RT PM at 36, 39.

[114] Exh. 352.

appear, his examination was delayed for about three months due to his health.[115]

105.   On June 25, 2013, Greenspan responded in part to document requests from Brown, providing a balance sheet and schedule of capitalized assets.[116]

106.   On June 28, 2013, Meredith reported that the coinsurance for the building and personal property appeared to be at compliance ratios of 89% and 80%, respectively, rather than the required 90%. He reported that the baler's cylinder did not need to be replaced and that repairs were estimated at $294,700. He included Werlinger's assessment that the replacement values of Sunwest's two wheel loaders were $95,863.28 and $74,670.28. Meredith determined that Belfor's cleanup after the fire included $169,866.95 for building-damage repairs, which were covered, and $220,642.94 for debris removal from the open yard, which Meredith opined was not covered by the Policies. In his "Recap," Meredith noted that the only item missing was the business-income loss, which he estimated to be $200,000. Meredith's Recap estimated building losses of $458,875.40, including the costs to repair the baler and the fence; personal property losses of $118,395.35, including repairs to one wheel loader; inland marine expenses of $45,000, representing repairs to the second wheel loader; and extra expenses of $20,851.45, for rental of a generator.[117]

107.   By August 8, 2013, Greenspan had provided some but not all of the information requested by Brown regarding the value of the personal

---

[115] Admitted Facts ¶¶ 85-86; Exhs. 244-45.

[116] Exh. 359.

[117] Exh. 11 at 1, 3-13; Ex. 205 at 2-5.

property, and no information had been provided about the business-income claim.[118]

108.   On August 16, 2013, Greenspan submitted four proofs of loss to Meredith claiming: (1) $582,938.00 for building damage; (2) $281,569.51 for business personal property loss; (3) $308,453.63 for loss of business income including rental value for extra expense; and (4) $98,487.02 for commercial auto damages. On September 4, 2013, Meredith forwarded the proofs of loss to Smith.[119]

109.   On September 5, 2013, Brown provided to Meredith a list of documents needed to complete a business-income analysis.[120]

110.   On September 9, 2013, Smith wrote to Greenspan, acknowledging receipt of the four proofs of loss but advising that "we do not have sufficient information to accept the proofs of loss" because Stanley's examination had not occurred and Brown had not completed his assessment of the business-income loss.[121]

111.   On September 12, 2013, Brown forwarded the list of documents needed to complete the business-income analysis to Star Insurance's counsel.[122]

112.   On September 16, 2013, Stanley was examined under oath. He stated that Sunwest was a "scrap metal company, engaged in the buying and selling of scrap metal." He stated that Sunwest bought and sold ferrous metals, nonferrous metals, paper, cardboard, and plastic obtained from the public and

---

[118] Exhs. 354, 359, 363; 4/7/15 RT AM at 51-58.

[119] Admitted Facts ¶¶ 86-87; Exh. 361 at 2; Exhs. 203-05.

[120] Exh. 249.

[121] Admitted Facts ¶ 88; Exh. 2 at 15; Exh. 241.

[122] Exh. 176.

from industrial accounts. Some of the industrial accounts provided baled materials to Sunwest, but the baler was used for all unbaled commodities, except heavy-gauge steel. He testified that paper had probably comprised the highest volume of Sunwest's business for the previous five years and cardboard was the largest commodity by revenue, but he could not estimate the percentages of Sunwest's business derived from a given commodity. Although daily records tracked all purchases and sales, commodities were not broken down by type in the monthly financial statements and inventory was taken annually. He testified that the representations in the 2011 and 2012 Supplemental Questionnaires were not correct but could not provide the correct responses. Stanley testified that the representation in Tom Dunlap's July 2011 e-mail that scrap plastic revenue was $5,000 was "wrong" and "nuts."[123]

113.   On September 23, 2013, counsel for Star Insurance requested that Sunwest make available to Brown its "daily records of all commodities bought and sold, as well as records of annual inventories," for the three years before the fire.[124]

114.   On October 15, 2013, Smith wrote to counsel for Sunwest, advising that Star Insurance continued to investigate the claim and would need Brown to finish reviewing requested documents before it could determine its view of the claim. In mid-November, Brown obtained copies of 56 boxes of Sunwest's daily records of purchases and sales. On November 27, 2013, Smith sent a letter to counsel for Sunwest advising that Brown was conducting an

---

[123] Admitted Facts ¶ 89; Exh. 201 at 7, 9-14, 24, 43-48, 51-53.

[124] Admitted Facts ¶ 90; Exh. 2 at 13; Exh. 250.

"expeditious review."[125]

115.   Brown completed his analysis of Sunwest's daily records on December 5, 2013. He calculated that from June 1, 2010, through April 26, 2013, Sunwest derived 65.99% of its revenue from paper products, and 25.68% of its revenue from metal products.[126]

116.   Star Insurance notified Sunwest by letter dated December 16, 2013, that it was rescinding the Policies. On March 4, 2014, Star Insurance sent a check in the amount of the total premiums paid by Sunwest for the Policies, which Sunwest did not cash.[127]

## I.   Amounts Payable Under the Policies

117.   The Policies provided Commercial Property, Commercial Inland Marine, and Employment Practices Liability coverage. The Commercial Property portion of the Policies included coverage for the Building, Personal Property, and Business Income (including rental value).[128]

### 1.   Inland Marine & Commercial Property (Personal Property)

118.   Sunwest submitted a proof of loss of Personal Property for $281,569.21, in which it included losses for stock, an alarm system, hoppers, roll-off bins, wheel loaders and accessories, and other supplies.[129]

119.   The alarm system was covered under the Building portion of the Commercial Property Policy. See infra Section B.2.

---

[125] Admitted Facts ¶¶ 91-93; Exhs. 242, 243.

[126] Admitted Facts ¶ 94; Exh. 283 at 2.

[127] Admitted Facts ¶¶ 95, 97; Exhs. 257, 289.

[128] Exh. 82 at 7, 27-29.

[129] See Exh. 203 at 2, 7, 10.

120.   Sunwest's proof of loss included loss of $35,502.00 for stock.[130]

121.   The Policies explicitly excluded "STOCK . . . STORED OUTSIDE OF THE BUILDING . . . , INCLUDING PROPERTY IN THE OPEN AND/OR WITHIN 100 FEET OF THE DESCRIBED PREMISES."[131]

122.   Star Insurance agrees that the other items included in the proof of loss were covered and only disputes the amount payable for the replacement wheel loaders and accessories.[132]

123.   The fire damaged two wheel loaders, a grapple bucket, foam wheels, and other equipment, including hoppers and roll-off bins. The damaged wheel loaders included a 2004 model purchased in 2006 and a 2001 model purchased in 2012.[133]

124.   The Policies provided for replacement-cost coverage of these items.[134]

125.   Sunwest purchased one used 2000 model and one new 2011 model. A used 2005 model was available and was a more comparable replacement than the new 2011 model for the 2004 model that was damaged.[135]

126.   Werlinger found that Sunwest could have purchased the 2000 and 2005 models, along with a grapple bucket and foam wheels, at a cost of

---

[130] See Exh. 203 at 7.

[131] Exh. 82 at 6, 104, 106.

[132] Star Insurance's Proposed Findings (Dkt. 168) ¶ 222.

[133] Exh. 203 at 10; Exh. 11 at 10, 15, 17.

[134] Exh. 82 at 47, 51

[135] Exh. 203 at 21-22.; Exh. 11 at 12, 21-22.

$170,533.56.[136]

127.   Based on Meredith's findings, Star Insurance calculates that the additional covered equipment, including hoppers and roll-off bins, totals $59,109.23.[137]

**2.   Commercial Property (Building)**

128.   Belfor provided general repairs after the fire, including pumping standing water, sandblasting the baler, providing temporary electrical power, and performing asbestos and lead testing.[138]

129.    Coverage for these services, totaling $169,866.95, was available under the Building portion of the Commercial Property Policy.[139]

130.   This does not include expenses incurred for debris removal.[140]

131.   Sunwest incurred costs of $13,534.00 in repairing its fence, $10,000 of which is payable under the Building portion of the Commercial Property Policy.[141]

132.   Sunwest incurred costs of $5,100.00 to repair the alarm system, which is payable under the Building portion of the Commercial Property Policy.[142]

133.   Sunwest documented only a portion of the repairs to the baler.[143]

---

[136] Exh. 11 at 22.

[137] See Star Insurance's Proposed Findings (Dkt. 168) ¶ 222.

[138] Exh. 204 at 2, 5-7; Exh. 205 at 2, 3-5.

[139] Exh. 11 at 5, 8, 32-42.

[140] See Exh. 11 at 5; see infra Section B.4.

[141] Exh. 11 at 4; Exh. 82 at 36, 40, 45; Exh. 204 at 2, 27-28.

[142] Exh. 203 at 10, 15, 18; Exh. 11 at 8.

[143] See Exh. 204 at 13-23, 25-26.

134.   The estimated total cost to repair the baler, including replacing the seals on its cylinder but not replacing or rebuilding the cylinder itself, which was determined to be unnecessary, was $299,124.53.[144]

### 3.   Commercial Property (Business Income)

135.   The Policies provided coverage for "the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" Business Income is defined as "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred" and "[c]ontinuing normal operating expenses incurred, including payroll."[145]

136.   The parties agree that the period of restoration was from April 22 to May 31, 2013.[146]

137.   Although Sunwest's retail counter was closed for several days, Sunwest continued to collect recyclable commodities from its industrial accounts throughout the period of restoration. As noted above, McNeal testified that Sunwest delayed pickups whenever possible ("The smaller customers, instead of picking them up every day, we try to move things around as best we could."). When Sunwest was unable to bale the commodities it collected, it was forced to sell them at a lower price to its competitors. Under these circumstances, it is difficult to calculate exactly what net income Sunwest lost due to the fire. Both sides offered expert testimony in an effort to quantify Sunwest's lost business income was during the period of restoration. Although

---

[144] See Exh. 9 at 4, 9-27; Exh. 11 at 4; Exh. 204 at 2, 12, 30.

[145] See Exh. 82 at 52.

[146] See Exh. 82 at 52, 59; 4/2/2015 RT PM at 16-17; 4/7/2015 RT AM at 75; see Star Insurance's Proposed Findings (Dkt. 168) ¶ 233.

both experts' testimony was helpful, neither was completely satisfactory.[147]

138.   Sunwest's expert, CPA Adam Minow, estimated that Sunwest's lost business income was $310,000. Minow compared Sunwest's gross profit from the period of restoration in 2013 to the same time period in 2012 and 2014. He found that Sunwest's gross profit from April 21 to May 31, 2013, was $334,000 and $287,000 lower, respectively, than it was during the same time period in 2012 and 2014. Taking the average of these two numbers, he estimated that Sunwest's lost business income was $310,000 during the period of restoration. Minow testified that he believe that this method produced the best measure of Sunwest's losses.[148]

139.   The Court does not find Minow's analysis wholly persuasive. His calculation assumes that Sunwest's business was cyclical, such that its operations in late April and May would be comparable among different years. The data presented suggests otherwise. Moreover, Minow also assumed that all of Sunwest's lost counter purchases would translate directly into lost profit. In the same way that Sunwest attempted to time-shift some of its pickups to avoid having to sell unbaled goods, however, some who sold recyclables at Sunwest's counter would likely have waited until Sunwest's counter re-opened, rather than selling their recyclables to a competitor.

140.   Star Insurance's expert, Kenneth Brown, estimated Sunwest's Business Income loss to be $158,504.[149]

141.   His analysis also had flaws that likely led him to underestimate Sunwest's losses. For instance, Brown averaged monthly sales for the six

---

[147] See 4/1/2015 RT PM at 79, 81-84; 4/2/15 RT AM at 12-14, 17, 22; 4/7/2015 RT AM at 85-87, 95-97.

[148] Exh. 180 at 2-5, 12.

[149] Exh. 182 at 2, 6.

months before and six months after the fire, but estimated cost of goods sold based on the fiscal year from April 1, 2012, to March 31, 2013, and he applied other variable costs based on estimates for the calendar year 2012. Using estimates determined from different data sets is particularly problematic given Brown's assertion that Sunwest's business was trending differently before and after the fire. Moreover, to the extent that Sunwest's decreased income was attributable to lower prices for unbaled commodities, applying cost of goods sold as a percentage of sales is problematic. Brown also found that Sunwest had reduced its payroll expenses during the period of restoration, but its accountant testified that all employees were working the day following the fire.[150]

142.   Although the Court finds the testimony of neither expert wholly persuasive, it does not doubt that Sunwest's net loss falls somewhere between $158,504 and $310,000. Having reviewed the totality of the evidence presented at trial, which includes not only the expert witnesses' testimony and their analysis but also the testimony of the fact witnesses, the Court determines that $200,000 is an accurate estimate of the net income lost by Sunwest during the period of restoration. The Court notes that this amount is consistent with the final estimate made by Meredith, a professional adjuster with nearly 40 years of experience.[151]

### 4.   Commercial Property (Extra Expenses)

143.   The Policies also provided for coverage of "Extra Expenses," defined as "necessary expenses [the insured] incur[s] during the 'period of restoration' that [it] would not have incurred if there had been no direct

---

[150] Exh. 182 at 3; see Exh 181 at 4-5.

[151] Exh. 11 at 1; 4/2/15 RT AM at 54.

physical loss or damage to property caused by or resulting from a Covered Cause of Loss." The Policies provide for payment of such Extra Expenses to "[a]void or minimize the 'suspension' of business and continue operations at the described premises" or "[m]inimize the 'suspension' of business if [the insured] cannot continue 'operations.'" The same period of restoration used to calculate Business Income coverage is used to calculate Extra Expenses.[152]

144.   Sunwest incurred costs of $240,798.49 for removal of debris in its yard. Although the materials removed consisted of largely stock stored in the open, which was not covered under the Policies, the removal of debris from the yard was necessary to continue Sunwest's operations, and was thus covered under the Policies as an expense required to minimize the suspension of business and to continue operations.[153]

145.   Sunwest incurred costs of $11,858.00 to repave its yard following the fire. Although paved surfaces do not constitute Covered Property under the Policies, repairs to the yard were covered as Extra Expenses because they were necessary to minimize the suspension of business and to continue operations.[154]

146.   Sunwest incurred costs of $6,480.00 for private security services in June 2013. Because these expenses were incurred after the period of restoration, they were not covered under the Policies.[155]

147.   Sunwest incurred expenses of $20,851.45 for the rental of generators from Belfor during the period of restoration, which expenses were

---

[152] See Exh. 82 at 52, 59.

[153] Exh. 205 at 2-5; Exh. 82 at 52, 157; Exh. 9 at 4-6.

[154] Ex. 204 at 2; Exh. 82 at 52, 157; Exh. 9 at 4; Exh. 82 at 39.

[155] Exh. 205 at 15, 17.

covered under the Extra Expenses portion of the Policies.[156]

## III.

## CONCLUSIONS OF LAW

**A.     Rescission and Waiver**

148.   Judge Carter found that there was no dispute that the representations made during the application process about the volume of Sunwest's paper and plastic recycling business were false. Judge Carter also found that Sunwest had raised no genuine issue of material fact about the materiality of those misrepresentations. As Judge Carter held, "[r]escission of an insurance policy is justified when material misrepresentations are made in the insurance application process, regardless of whether the misrepresentations are intentional or unintentional." Thus, the Dunlaps' misrepresentations were sufficient grounds for Star Insurance's rescission of the Policies, unless Sunwest can establish an affirmative defense to rescission.[157]

149.   Under California law, an insurer's right to information about material facts may be waived by its neglect to make inquiries as to such material facts where they are "distinctly implied" in other facts communicated to the insurer. Thus, although an insurer generally has no duty to inquire as to the truth of representations of fact made by the insured or its agent in an application, a duty to inquire may arise if the insurer or its agent is made aware of facts which bring those representations under suspicion and would induce a prudent person to make inquiry.[158]

---

[156] Exh. 204 at 2 to 6; Exh. 11 at 8.

[157] See Summary Judgment Order (Dkt. 56) at 12, 21.

[158] Cal. Ins. Code § 336(b); see DuBeck v. Cal. Physicians' Serv., 234 Cal. App. 4th 1254, 1267-68 (2015); Rutherford v. Prudential Ins. Co. of Am., 234 Cal. App. 2d 719, 735 (1965); DiPasqua v. Cal. W. States Life Ins. Co., 106 Cal. App. 2d 281, 284-85 (1951); see also Jaunich v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 647 F. Supp. 209, 211-12 (N.D.

150.   In order to succeed in establishing an affirmative defense of waiver, Sunwest must establish by clear and convincing evidence that Star Insurance or any of its agents was in possession of information that "distinctly implied" that Sunwest's paper and plastic processing exceeded the amounts represented by the Dunlaps.[159]

151.   Here, the Court finds, based on the following facts established at trial, that the clear and convincing evidence shows that employees of G.J. Sullivan and Meadowbrook were in possession of facts that distinctly implied that Sunwest's applications contained material misrepresentations regarding the extent of its paper and plastic recycling operation.

a.   First, on June 30, 2011, when Sunwest's application was first being considered, LeMoine alerted G.J. Sullivan and her superiors at Meadowbrook that Sunwest's website indicated that paper and plastic were recycled on site, noting that "complete details on plastic and paper recycling – in both revenue and actual amount on the premises" would be needed. Because LeMoine communicated her findings and concern to Priolo, King, Jacobs, and Dubetz, all at G.J. Sullivan and Meadowbrook who were directly involved with Sunwest's initial application were alerted to a potential issue with its paper and plastic processing.

b.   Second, on July 7, 2011, when Priolo requested "complete

---

Cal. 1986) (finding issue of fact regarding waiver where insurer learned of facts that clearly implied that statements in application were inaccurate but made very little effort to obtain clarification); Xiong v. Lincoln Nat. Life Ins. Co., No. 08-345, 2009 WL 1549289, at *7 (E.D. Cal. May 29, 2009) (finding issue of fact as to whether insurer knew or should have known of existence of insured's other life insurance policies).

[159] Cal. Ins. Code § 336(b); Alta Bates Summit Med. Ctr. v. United of Omaha Life Ins. Co., No. 07-04224, 2009 WL 2487995, at *2 (N.D. Cal. Aug. 13, 2009) (holding that waiver must be established by clear and convincing evidence (citing City of Ukiah v. Fones, 64 Cal.2d 104, 107-08 (1966); Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 31 (1995))).

details on plastic and paper – in both revenue and actual amount on the premises," Tom Dunlap responded only that scrap plastic and newspaper brought in $5,000 and $10,000, respectively – not specifying whether those were annual, quarterly, monthly, or daily figures – and provided no estimate regarding the quantities of these materials on site. Tom Dunlap's incomplete and imprecise response suggested that he was either careless or unaware of the importance of this factor under the Scrap Dealers Program. Yet none of the G.J. Sullivan or Meadowbrook personnel who saw this response, all of whom knew of LeMoine's concern after viewing Sunwest's website, suggested that further information be sought from Tom Dunlap, even though G.J. Sullivan did not have an established relationship with the Dunlaps and the coverage sought for Sunwest was of a high enough value to have mandated referral to Meadowbrook.

c.    Third, that Tom Dunlap's July 7, 2011 e-mail was insufficient to allay the concern raised by Sunwest's website was confirmed by King's explicit request that the amount of paper and plastic processing be confirmed by the loss-control report and that the report be provided to Meadowbrook, a request later repeated by Dubetz. Meadowbrook had never before requested a copy of a loss-control report from Priolo, let alone requested it twice. Despite King's specific request that the quantity of paper and plastic recycling be confirmed by the loss-control report and his unusual request for a for a copy of the report, Priolo did not specify that the inspector should seek estimates of the percentages of each commodity processed by Sunwest.

d.    Fourth, the loss-control report, received by Priolo and LeMoine on October 5, 2011, described Sunwest's operations as the purchase and sale of "aluminum, glass and paper." Although the report did not specify the quantities of each commodity visible on site, it suggested that either the primary materials visible at the time of the inspection were aluminum, glass,

and paper or that a representative of Sunwest reported that these were its
primary commodities. Either way, the primary materials noted by the
inspector were <u>not</u> aluminum, steel, and other metals, as would be expected
based on Sunwest's application. Despite King's request that the amount of
paper and plastics processing be confirmed by the loss-control report, and
although the report suggested that Sunwest might have been processing more
paper than was acceptable under the Scrap Dealers Program, neither Priolo
nor LeMoine sought clarification regarding the description of Sunwest's
operations in the report. Although Star Insurance presented evidence that such
reports were based on brief, generic inspections for which G.J. Sullivan paid
only $125, that tends to confirm that a routine loss-control report was an
inadequate means to verify the details of Sunwest's operations. Moreover, the
parties agreed that, although limited, such reports could result and had resulted
in cancellation of policies. Particularly given the questions regarding Sunwest's
eligibility and the fact that neither Star Insurance nor its agents had an existing
relationship with the Dunlaps or their proffered applicant, Rott's clear
indication that paper was a significant part of Sunwest's operations should
have been investigated further.

        e.    Fifth, when Rott again inspected Sunwest in January 2012,
in connection with its application for a workers' compensation policy, he
provided to G.J. Sullivan photographs depicting large bales of cardboard in
Sunwest's yard. A relatively small number of Meadowbrook and G.J. Sullivan
personnel worked within the Scrap Dealers Program, and most were aware of
the initial concerns regarding Sunwest's operations. Moreover, LeMoine was
the Meadowbrook employee overseeing the underwriting of the workers'
compensation policy. Yet she did not review the report, nor did anyone at G.J.
Sullivan note that an entity insured as a scrap dealer appeared to be processing
more than incidental quantities of cardboard.

f.      Sixth, on February 20, 2012, LeMoine received the WCIRB report indicating that as of July 2008, Sunwest's accountant estimated that the purchase and sale of newspaper, computer paper, and cardboard comprised 35% of Sunwest's business. Although the WCIRB report was over three years old, it added to the existing evidence that Sunwest's paper processing was more than incidental.

g.      Seventh, on or before October 18, 2012, Priolo noticed a "DISCREPANCY" between the representations in the 2012 Supplemental Questionnaire and the description in the 2011 loss-control report that Sunwest "purchas[ed] aluminum, glass and paper." Given that the representations as to commodity breakdowns were the same in the 2011 and 2012 Supplemental Questionnaires, Priolo's e-mail underscores that, at least as of her receipt of the 2011 loss-control report, G.J. Sullivan was in possession of information that distinctly implied that Sunwest's operations made it ineligible for the Scrap Dealers Program. Moreover, Dean Dunlap's response to her inquiry was brief and not credible. He explained that metals comprised essentially 100% of Sunwest's operations, but the percentages of various commodities on site varied daily – implying that although nonmetals comprised less than 1% of total annual sales, there happened to be enough glass and paper on site the day that Rott visited to make it seem as though these were among the three primary commodities processed by Sunwest. Yet Priolo did not challenge this explanation, nor is there any evidence that she sought guidance from Mesko or anyone else.

h.      Eighth, the March 2013 audit of Sunwest noted its processing of cardboard, plastics, CRV beverage containers, newspaper, office paper, and other grades of paper for both its commercial and residential clients. Again, none of the Meadowbrook or G.J. Sullivan personnel responsible for the underwriting of Sunwest responded to this evidence of possible ineligibility

43

1   under the Scrap Dealers Program.

2       152.   In sum, despite receiving several documents and communications

3   that consistently showed that the amount of paper and plastics processing at

4   Sunwest far exceeded that represented in the Supplemental Questionnaires and

5   permitted under the Guidelines, Star Insurance and its agents did little to

6   investigate or confirm the representations by the Dunlaps. As Star Insurance's

7   own expert witness testified at his deposition, Star Insurance and its agents

8   were "casual" in the way they pursued the underwriting issues in this case.[160]

9   No one from G.J. Sullivan or Meadowbrook ever spoke to the Dunlaps by

10  phone, let alone in person; followed up with Pacific Inspections to confirm

11  details in its reports; requested a more thorough inspection of Sunwest than

12  that afforded by Rott's 10-minute, $125 visit; or even requested permission to

13  visit Sunwest. Although employees from G.J. Sullivan and Meadowbrook

14  emphasized that they followed established protocol and industry custom in

15  their conduct, the numerous red flags raised by the various reports and

16  communications concerning Sunwest's operations imposed upon Star

17  Insurance a duty to investigate further.[161]

18      153.   Having failed to do so, Star Insurance waived its right to rescind

19  the Policies.

20      154.   Because Star Insurance was not entitled to rescind the Policies, it

21  was bound to provide fire-loss payments according to their terms, and

22  breached its obligations under the Policies by failing to do so.

23  ///

24  ///

25  ————————————————

26  [160] See 4/3/15 RT AM at 44.

27  [161] See Cal. Ins. Code § 336(b); DuBeck, 234 Cal. App. 4th at 1267-68; Rutherford,
    234 Cal. App. 2d at 735; DiPasqua, 106 Cal. App. 2d at 284-85.

28

**B.      Amounts Payable to Sunwest Under the Policies**

     **1.      Personal Property**

     155.   Adjusting Sunwest's proof of loss to exclude the damaged stock and the alarm system and to include Werlinger's estimate of the replacement cost for the wheel loaders and accessories bring the Personal Property losses to $229,642.79. $45,000 is payable under the Inland Marine Policy, which carried a $1000 deductible. After applying $44,000, an additional $185,642.79 remains, which is payable under the Personal Property portion of the Commercial Property Policy.[162]

     156.   Applying the Policies' co-insurance calculation,[163] the total amount payable to Sunwest for the wheel loaders, grapple bucket, foam wheels, and other equipment is:

$$\frac{[\text{Total Loss before Deductible}] * [\text{Limit of Insurance}]}{[\text{Value of Covered Property}] * (0.9)}$$

$$= \frac{[\$185,642.79] * [\$1,000,000]}{\$1,232,180 * (0.9)}$$

$$= \mathbf{\$162,402.30}$$

     **2.      Commercial Property (Building)**

     157.   The total losses covered by the Building portion of the Commercial Property Policy amount to $484,091.48. Applying the Policies' co-insurance calculation to this amount,[164] the total amount payable to Sunwest for repairs to its Building is:

---

[162] Exh. 82 at 38-39, 47, 81-82; see Star Insurance's Proposed Findings (Dkt. 168) (Dkt. 168) ¶ 224.

[163] See Exh. 82 at 48-49.

[164] See Exh. 82 at 29.

$$\frac{\text{[Total Loss before Deductible] * [Limit of Insurance]}}{\text{[Value of Covered Property] * (0.9)}}$$

$$= \frac{[\$484{,}091.48] * [\$1{,}363{,}819]}{[\$1{,}695{,}614] * (0.9)}$$

$$= \mathbf{\$432{,}628.05}$$

**3.   Commercial Property (Business Income)**

158.   The amount covered by the Business Income portion of the Commercial Property is $200,000.

**4.   Commercial Property (Extra Expenses)**

159.   The total amount payable to Sunwest under the Extra Expenses portion of the Commercial Property Policy is $273,507.94.

**5.   Total Amount Due to Sunwest**

160.   In sum, the total amount payable to Sunwest under the Policies is:

| Policy Provision | Amount |
|---|---|
| Inland Marine (less deductible) | $44,000.00 |
| Commercial Property (Personal Property) | $162,402.30 |
| Commercial Property (Building) | $432,628.05 |
| Commercial Property (Business Income) | $200,000.00 |
| Commercial Property (Extra Expenses) | $273,507.94 |
| Less Commercial Property deductible | ($5,000.00) |
| Less Advance Payment | ($130,000.00) |
| **Total** | **$977,538.29** |

**C.   Sunwest's Bad Faith and Section 3294 Claims**

161.   "In order to establish a breach of the implied covenant of good faith and fair dealing under California law, a plaintiff must show: (1) benefits

46

due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause."[165]

162.   "It is now settled law in California that an insurer denying . . . the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability . . . is not liable in bad faith even though it might be liable for breach of contract."[166]

163.   "An insurer which denies benefits reasonably, but incorrectly, will be liable only for damages flowing from the breach of contract, i.e., the policy benefits."[167]

164.   Sunwest contends Star Insurance failed to diligently conduct a fair and objective investigation of Sunwest's fire loss claim.[168] Specifically, Sunwest notes that Star Insurance failed to interview those responsible for approving Sunwest's applications for coverage; repeatedly requested sensitive information unnecessary for the claim investigation, such as the Social Security numbers of the individual owners; and misrepresented to Sunwest the reason it sought that information.[169] Sunwest essentially contends that Star Insurance made a show of investigating the fire-loss claim while in fact investigating the possibility of rescission of the Policies, in hopes that Star Insurance would be able to gather information in support of rescission and related litigation and "beat[] Sunwest

---

[165] Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001) (citing Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1151 (1990)); see also Dynamic Concepts, Inc. v. Truck Ins. Exch., 61 Cal. App. 4th 999, 1010 (1998) ("A carrier is subject to tort liability for bad faith only where it unreasonably fails to provide benefits due under the policy or the law.").

[166] Chateau Chamberay Homeowners Ass'n v. Asssociated Int'l Ins. Co., 90 Cal. App. 4th 335, 347 (2001).

[167] Morris v. Paul Revere Life Ins. Co., 109 Cal. App. 4th 966, 977 (2003).

[168] See Sunwest's Closing Brief (Dkt. 170) at 7-10.

[169] Id.

47

to the courthouse."[170] Sunwest thus contends that Star Insurance acted in bad faith, making it liable for Sunwest's attorneys' fees, and that it acted fraudulently and oppressively, warranting an award of punitive damages under California Civil Code Section 3294.[171]

165.    Star Insurance had a right to investigate whether it had a basis to rescind the Policies. That Star Insurance was investigating possible grounds for rescission at the same time that it was investigating the fire losses and extent of coverage under the Policies does not in itself establish that Star Insurance conducted its investigation in bad faith.

166.    Although Meadowbrook personnel investigating the fire-loss claim were alerted immediately after the fire to the likelihood that Sunwest's operations had been misrepresented on its applications for coverage, Star Insurance actively investigated the fire-loss claim. In particular, Meredith's investigation, reports, request to retain a forensic accountant, and recommendations for advance payments to Sunwest suggest that Star Insurance was acting in good faith. Moreover, some of the delay in determining the extent of the loss and coverage was attributable to the challenges of Sunwest's recordkeeping system, which, for example, added to the time it took Greenspan to respond to requests for information from Brown. Additionally, the evidence at trial showed that the fire-loss investigation was also delayed by Stanley's poor health, which delayed his EUO by several months.

167.    Sunwest's best argument for bad faith relies on two facts. First, Smith's May 29, 2013 letter did not correctly identify the reason Star Insurance

---

[170] Id. at 10.

[171] Id.

48

sought a breakdown of commodities processed by Sunwest.[172] Second, Kaufman conceded in her testimony that Star Insurance did not tell Sunwest the real reason for its request for fear that Sunwest would initiate litigation.[173] The Court does not find that these facts alone are sufficient to establish that Star Insurance acted in bad faith.

168.   The Court finds by a preponderance of the evidence that there was a genuine dispute as to Sunwest's entitlement to benefits under the Policies. Put differently, the Court finds that Star Insurance has raised a genuine issue as to its liability, and that Star Insurance's decision to seek rescission of its Policies was objectively reasonable. As a result, Sunwest has failed to establish a claim of bad faith.

169.   Sunwest also argues that it is entitled to exemplary damages under California Civil Code Section 3294. To recover exemplary damages under Section 3294, Sunwest must establish by "clear and convincing evidence" that Star Insurance's misrepresentation regarding the extent of its investigation constituted "oppression, fraud, or malice." Sunwest contends that Star Insurance's conduct constituted "oppression" or "fraud."[174]

170.   "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise

---

[172] See supra ¶ 101.

[173] See supra ¶ 102.

[174] Sunwest's Closing Brief (Dkt. 170) at 10.

causing injury.[175]

171.   Sunwest has not provided evidence sufficient to establish that Star Insurance engaged in either oppression or fraud as defined by the statute.

## IV.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court concludes that Star Insurance is not entitled to a declaratory judgment finding that it was entitled to rescind the Policies. The Court further concludes that Star Insurance is liable for breach of contract as alleged by Sunwest in its second counterclaim for relief. The Court concludes that Sunwest is entitled to a payment of $977,538.29 under the Policies. The Court concludes that Star Insurance did not breach the implied covenant of good faith and fair dealing. Sunwest is directed to submit a proposed judgment in conformance with these findings of fact and conclusions of law.

Dated:  June 15, 2015

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge

---

[175] Cal. Civil Code § 3294(c)(2)-(3).